UNITED STATES DISTRICT COURT
FOR THE
RICHMOND DIVISION FOR
THE EASTERN DISTRICT OF VIRGINIA

| | | |
|---|---|---|
| **POLYKON MANUFACTURING LLC** | ) | |
| | ) | |
| *Plaintiff,* | ) | Civil Action No. __3:23cv00751__ |
| | ) | |
| **v.** | ) | **Jury Trial:      Selected** |
| | ) | |
| **GEA PROCESS ENGINEERING INC.** | ) | |
| | ) | |
| *Defendant.* | ) | |

## ORIGINAL COMPLAINT

Plaintiff Polykon Manufacturing LLC ("Plaintiff" or "Polykon") hereby files this Original Complaint for Breach for Contract, Breach of Warranty, Professional Negligence and Unjust Enrichment against Defendant GEA Process Engineering, Inc. ("Defendant" or "GEA").

## I.      SUMMARY OF THE CASE

1.      In short, Polykon paid GEA approximately $2.25 million pursuant to Purchase Order HAMBEQP06 (the "Contract") to manufacture, deliver, provide installation oversight and commission a specialty nitrogen closed loop atomization unit (the "Atomizer") meeting very specific Performance Guarantees and Production Standards (the "Performance Guarantees") so that Polykon could manufacture specialty cosmetic ingredients and products at its Sandstone, Virginia, manufacturing facility (the "Plant"). A true and accurate copy of the Contract is attached as **Exhibit A**.

2.      After Polykon paid GEA the $3 million and started using the Atomizer, it consistently failed to meet GEA's contractual Performance Guarantees, continually broke down and required repairs (that Polykon paid for) and malfunctioned on multiple occasions costing Polykon approximately $1.8 million in direct, out-of-pocket damages to both purchase

1

replacement products and services, and pay for services and parts to repair and remedy the Atomizer. Polykon sent GEA multiple demands to remedy the issues under the Contract. But GEA refuses to do anything, leaving Polykon with no choice but to file this suit to recover its direct damages. All told, Polykon's direct, out-of-pocket damages for manufacturing costs, parts and repair, and production shortfall issues resulting from GEA's breach of the Contract are $1,807,100. Polykon seeks that amount along with its costs, fees and interest as provided for by the Contract and Virginia law.

## II.    JURISDICTION & VENUE

3.    This Court has jurisdiction over this matter based upon 28 U.S.C. §1332(a) as this case is based upon the complete diversity of citizenship between the parties and the fact that the amount in controversy exceeds the sum of $75,000. As explained below, for diversity purposes, Polykon is a citizen of New Jersey, and GEA is a citizen of Maryland. There is therefore complete diversity under 28 U.S.C. §1332(a). This Court also has jurisdiction over this matter pursuant to the doctrine of supplemental jurisdiction as codified in 28 U.S.C. § 1367.

4.    Venue is proper in this Judicial District under 28 U.S.C. § 1391(b) because: (a) the Contract provides for mandatory venue and jurisdiction in Virginia; (b) the Plant is located in this forum and the Contract provides for material performance in the Richmond Division; and, (c) all or a substantial part of the events giving rise to this matter occurred here, and these causes of action arise in material part out of actions taken within the Eastern District of Virginia.

## III.    PARTIES

5.    Plaintiff Polykon Manufacturing LLC is a Delaware Limited Liability Company operating the Plant at 6201 Engineered Wood Way, Sandston, Virginia 23150. Polykon is ultimately owned by a New Jersey corporation with its principal place of business in New Jersey.

For diversity purposes, therefore, Polykon is a citizen of New Jersey.

6.      Defendant GEA Process Engineering Inc. is a Maryland corporation with its principal place of business at 9165 Rumsey Road, Columbia, Maryland 21045. For diversity purposes, therefore, GEA is a citizen of Maryland and there is, therefore, complete diversity between the parties.

### IV.     FACTS

7.      Polykon and GEA entered into the Contract to both build, ship, assist with installation, commission and test a new Atomizer at Polykon's Sandstone, Virginia, Plant. The process to build, ship, install, commission, and test the Atomizer took several years – in large part, due to GEA's incompetence – and the process was ultimately not completed until around April 2021.

8.      By way of background, Polykon manufactures cosmetic ingredients and related products from its Plant. As part of that manufacturing process, it utilizes an Atomizer to create specialty products to meet routine, continued, contracted for customer demand. Because of those known commitments, Polykon needed to ensure that GEA's Atomizer met certain Performance Guarantees and standards – after all, if the Atomizer was too slow, or the product below standards, then Polykon could not perform on its contractual commitments to its own customers and ultimately it would be liable for damages. All of this was specifically memorialized in the Contract, understood and foreseen at the time of the Contract and directly contemplated by the agreed terms.

9.      In fact, a detailed set of Performance Guarantees for the Atomizer was attached as Appendix 2, and incorporated into the Contract, memorializing the speed and quality of product required for the Atomizer. Those Performance Guarantees created a material obligation in the Contract for GEA to ensure the Atomizer met specific quality, production, temperature and process

3

parameters. Failure to meet those Performance Guarantees, obviously, would mean that Polykon could not meet its customer commitments as explained in the Contract, and that Polykon would suffer direct damages as a result.

10.     As noted above, GEA suffered significant delays and troubles in building and installing the Atomizer at Polykon's Plant. After the Atomizer was first started up in January 2021, synthetic isoparaffin oil (called "Isopar") started leaking out in several sections. After several analyses, GEA informed Polykon that the Atomizer would require a new demister unit and that GEA would order that part. Almost incredibly, after several follow ups, GEA admitted that it "forgot" to order the demister unit, and the issues were not fixed until around November 2021. And at that, Polykon was then forced to pay for the required installation and modification to the Atomizer.

11.     Then in September and December 2021, the Atomizer again malfunctioned and broke several atomizer shafts and related equipment – likely due to defective vibration safety equipment provided by GEA. In short, GEA accidently mismatched parts and data sheets, resulting in excessive vibrations and dangerous operating conditions within the manufacturing process chain. As a result, the Atomizer could only function at approximately half capacity for several months – far, far below the Performance Guarantees that GEA made in the Contract.

12.     As if that was not enough, Polykon discovered that GEA provided the wrong feed distributor for the Atomizer, and that GEA miscalculated the required viscosity by almost thirty times. Again, Polykon was forced to make the corrections mostly at its own cost and time, and GEA refused to correct or pay for its mistakes. As a direct result of GEA's breaches and poor practices, Polykon was required to obtain alternative cover products and production services to replace the products that GEA guaranteed the Atomizer would produce. Those direct replacement

purchases cost Polykon $1.538 million – all a direct result of GEA's breach of contract and failure to provide an Atomizer that would meet the Performance Guarantees. Again, these are direct damages that flow naturally or ordinarily from the contract breach – the failure to meet the Performance Guarantees caused the absolute and necessary result that Polykon was required to go obtain alternative goods and services to replace the ones GEA guaranteed in the Contract.[1] That is a direct result of the breach.

13.    Similarly, as noted above, Polykon was forced to purchase replacement parts and repair the Atomizer itself – as GEA was either incapable or unwilling (or possibly both) to do so itself in the required timeframes. Those repairs and replacement parts cost Polykon another $270,000. Again, these are direct damages that flow naturally or ordinarily from the contract breach. All told GEA's breaches, failures, and poor workmanship caused direct, tangible, out-of-pocket damages in the total amount of approximately $1,810,000. Polykon therefore files this suit to recover that amount, as well as its costs, attorneys' fees and both pre- and post-judgment interest.

## V.    CAUSES OF ACTION

### A.    Breach of Contract/Breach of Warranty:

14.    The Contract is a valid and binding contract. Polykon fully performed and fully paid over $3 million to GEA for the Atomizer based upon the written and understood agreement that the Atomizer would properly function and meet the Performance Guarantees.

---

[1] Under Virginia law, "[t]here are two broad categories of damages which may arise from a breach of contract. Direct damages are those which flow naturally or ordinarily from the contract breach. Consequential damages occur from the intervention of special circumstances that are not ordinarily predictable." *Long v. Abbruzzetti*, 254 Va. 122, 126, 487 S.E.2d 217, 219 (Va. 1997).  In the UCC, "direct damages" are those that flow directly from the breach (like the delta between cover costs), while "incidental damages" are those "resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach." Va. Code Ann. §§ 8.2-715. In this instance, all claimed damages are direct damages as Polykon does not seek to recover its transportation, inspection, commission or other incidental expenses or damages.

5

15.     GEA, for its part, failed to perform its part of the Contract back to Polykon, and GEA provided a malfunctioning Atomizer that failed (and continues to fail for some time) the Performance Guarantees in the Contract. GEA, therefore, is in breach of the Contract.

16.     As a result of GEA's breaches, Polykon has suffered direct damages in the form of cover and alternative purchases of goods and services, as well as repair and replacement costs and fees relating to remedying the Atomizer, in the amount of $1,810,000.

17.     Additionally, Polykon provided written notice of breach and an opportunity to cure to GEA on several occasions – all of which GEA ignored – and Polykon is therefore entitled to recover its attorney's fees along with all pre/post judgment interest and recoverable costs and fees.

**B.      Professional/Design Negligence:**

18.     GEA is a design professional and the work under the Contract was to be performed by professional, licensed engineers.

19.     Under Virginia law, design and engineering professionals must adhere to their professional standard of care, working as carefully as other design professionals under the same or similar circumstances.  GEA's failure to adhere to that professional standard of care to ensure that the Atomizer would properly function and meet the Performance Guarantees constitutes professional and design negligence.

20.     Virginia law also provides that design professionals – such as GEA – owe that duty to contractual partners – like Polykon – to adhere to the professional standard of care. Here, again, GEA breached that standard of care by providing an Atomizer that failed (and continued to fail for some time) the Performance Guarantees in the Contract. GEA, therefore, is liable for professional and design negligence.

21.     As a result of GEA's breaches, Polykon has suffered direct damages in the form of

cover and alternative purchases of goods and services, as well as repair and replacement costs and fees relating to remedying the Atomizer, in the amount of $1,810,000.

**C.**   <u>**Unjust Enrichment/Restitution:**</u>

22.    Under Virginia law, unjust enrichment and/or restitution occurs when a plaintiff shows that: (1) it conferred a benefit on the defendant; (2) with the reasonable expectation of receiving a benefit in return; (3) the defendant knew or should have known of both the benefit conferred and the expectation of a reciprocal benefit; and that (4) allowing the defendant to accept or retain the benefit without paying for its value would be inequitable. In other words, contract or no contract, if one business provides payment to another and both parties understand that the payment is provided for a specific service, the party receiving the payment cannot avoid its duty to perform. That would lead to an inequitable result, which the law does not allow. The same is true here.

23.    In this instance, there is an implied contract basis for requiring restitution because it would be unjust for GEA to retain all of the money Polykon paid while knowingly and willfully admitting that the Atomizer fails to meet the required Performance Guarantees.

24.    Therefore, in the alternative and to the extent that GEA claims the Contract is somehow not binding or fails to account for this issue, Polykon also pleads these causes of action in equity for recovering GEA's ill-gotten gains.

25.    As a result of GEA's breaches, Polykon has suffered direct damages in the form of cover and alternative purchases of goods and services, as well as repair and replacement costs and fees relating to remedying the Atomizer, in the amount of $1,810,000. GEA should not be permitted to keep those profits and is required to disgorge and return them to Polykon as part of the direct damages in this matter.

## VI.    CONDITION PRECEDENT

26.    All conditions precedent to the filing of this suit have been performed, occurred, or been waived, including all conditions precedent required to recover attorney's fees, costs and interest in this matter.

## VII.    CONCLUSION & PRAYER

27.    Plaintiff Polykon therefore respectfully requests that the Court enter Judgment against Defendant GEA in this matter, that Plaintiff be awarded its damages for breach of the Contract in the approximate amount of at least $1,810,000, attorney's fees, pre- and post-judgement interest, cost, fees, restitution and/or disgorgement of profits, and for such other and further relief, general and special, legal and equitable, to which Plaintiff Polykon may show itself justly entitled.

Respectfully submitted,

*/s/ J. Travers Clark*
Jeffrey G. Gilmore
VA Bar No. 21971
Jeff.gilmore@akerman.com
J. Travers Clark
VA Bar No. 94706
trav.clark@akerman.com
750 Ninth Street, N.W.
Suite 750
Washington, D.C. 20001
Tel:  202-393-6222
Fax: 202-393-5959

**ATTORNEYS-IN-CHARGE PLAINTIFF POLYKON MANUFACTURING LLC**

**OF COUNSEL:**

**AKERMAN, LLP**

**James E. Rogers**
Texas Bar No. 24051265
S.D. Texas Bar No. 614580
james.rogers@akerman.com
1300 Post Oak Boulevard, Suite 2500
Houston, Texas  77056
Telephone:  713-623-0887
Facsimile:  713-960-1527
[*Pro Hac Pending*]